# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

---

m 01-60373
Summary Calendar

---

FERDINAND OMAGAH,

Petitioner,

VERSUS

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

---

Petition for Review of an Order of
the Board of Immigration Appeals

---

April 22, 2002

Before JONES, SMITH and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Ferdinand Omagah petitions for review of an order of the Attorney General refusing to grant a discretionary suspension of deportation. The Immigration Judge ("IJ") and Board of Immigration Appeals ("BIA") concluded that Omagah's conviction, under 18 U.S.C. § 371, of conspiracy to obtain, possess, and use fraudulent immigration documents barred suspension. We deny the petition for review.

## I.

Omagah, a Nigerian citizen, originally entered the United States on August 12, 1981, using an F-1 student visa and resided there from August 12, 1981, to the present, with the

exception of two thirty-day visits to see his parents. Omagah applied for permanent residence through the amnesty program, and his application was pending on April 11, 1995.

On August 4, 1995, the Attorney General initiated an order to show cause why Omagah should not be deported because (1) he had overstayed his student visa; and (2) he had been convicted of conspiring to obtain, possess, and use false immigration documents.

On December 19, 1995, the IJ ordered Omagah deported to Nigeria, then considered his request for suspension of deportation and voluntary departure. At the suspension hearing, the government introduced the plea agreement and accompanying factual resume and argued that Omagah was *per se* ineligible for suspension because the conviction established that he lacked good moral character.

The IJ found that Omagah lacked good moral character for two reasons. First, the IJ agreed that the conspiracy to obtain, possess, and use illegal immigration documents proved, as a matter of law, that Omagah lacked good moral character. Second, the IJ found that Omagah had testified falsely under oath at the suspension hearing: His testimony that he merely was inquiring about his immigration status during the meeting with the immigration officer was belied by the plea agreement and factual resume. The IJ found that Omagah had perpetrated a fraud on the court by testifying falsely. The BIA upheld the IJ's decision on appeal.

II.

The Attorney General has discretion to suspend an alien's deportation for criminal convictions if the alien

is deportable under paragraph (2), (3), or (4) of section 1251(a) of this title; has been physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1254(2) (1994 ed.).[1] So, the statute establishes two prerequisites before the Attorney General may find "exceptional and extremely unusual hardship" and suspend deportation: (1) continuous residence for over ten years and (2) "good moral character." If the alien fails to satisfy one of those prerequisites, the Attorney General lacks the discretion to suspend deportation under § 1254.[2]

There is a two-part standard to review the BIA's finding that the alien *per se* lacks "good moral character." *Hamdan v. INS*, 98 F.3d 183, 185 (5th Cir. 1996). First, we consider

---

[1] We apply the waiver provisions of the Immigration and Nationality Act ("INA") as they existed at the time the alien pleaded guilty. *INS v. St. Cyr*, 533 U.S. 289 (2001). We consider the 1995 version of the § 1254, because Omagah pleaded guilty on August 3, 1995.

[2] Even if the alien satisfies those prerequisites, the Attorney General may decline to suspend deportation. *Moosa v. INS*, 171 F.3d 994, 1012-13 (5th Cir. 1999).

whether the BIA has applied the correct legal standard to determine good moral character. *Id.* We must accord deference to the BIA's legal interpretation of "good moral character" and "moral turpitude" as used in the INA. *Id.* If the phrases are ambiguous, we defer to the BIA's reasonable interpretation. *Id.*[3] We will review *de novo*, however, the interpretation of federal and state criminal statutes. *Hamdan*, 98 F.3d at 185. Determining a particular federal or state crime's elements lies beyond the scope of the BIA's delegated power or accumulated expertise.

If we determine that the BIA has interpreted the INA reasonably and the substantive criminal law correctly, we proceed to the second step, in which we use the "substantial evidence" test to evaluate the BIA's factual finding that a specific alien lacks "good moral character." *Id.* (quotation omitted) (citation omitted). The substantial evidence standard requires only that the BIA's decision be supported by record evidence and be substantially reasonable. *Id.* (quotation omitted) (citation omitted); *Mikhael v. INS*, 115 F.3d 299, 302 (5th Cir. 1997).

We lack jurisdiction to review the BIA's discretionary decisions. Omagah challenges a BIA decision issued after October 31, 1996, in a deportation case initiated before April 1, 1997, so we have jurisdiction under the transitional rules set forth in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").[4] IIRIRA's transitional rules strip the courts of appeals of jurisdiction over the Attorney General's "discretionary decisions" over whether to suspend deportation.[5] For example, we lack the jurisdiction to review the BIA's discretionary judgment concerning whether the alien's citizen family members would suffer "unusual and extremely severe hardship." *Moosa*, 171 F.3d at 1010-11.

The alien, however, must satisfy the residency requirement and prove statutory eligibility for "good moral character" *before* the BIA exercises its discretion. The question of "good moral character" is not left entirely to the executive's discretion. Convictions of crimes of "moral turpitude" establish *per se* an absence of "good moral character."[6] Where the

---

[3] Because the BIA interpreted the INA through formal adjudication, we give its interpretation *Chevron* deference. *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (explaining that *Chevron* deference is due when an agency acts according to legally delegated authority inherent in formal adjudication); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 423-25 (1999) (stating that BIA should receive *Chevron* deference for interpretations made during case-by-case adjudication); *Faddoul v. INS*, 37 F.3d 185, 188 (5th Cir. 1994) ("We accord deference to the BIA's interpretation of the immigration statute unless there are compelling indications that its interpretation is incorrect.") (citation omitted).

[4] IIRIRA §§ 309(a), 309(c)(4), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996); *Rodriguez-Silva v. INS*, 242 F.3d 243, 246 (5th Cir. 2001); *Moosa*, 171 F.3d at 1010. The pre-IIRIRA, INA § 106 jurisdictional provisions establish a default where there is a gap in the transitional rules. *Rodriguez-Silva*, 242 F.3d at 246.

[5] IIRIRA § 309(c)(4)(E) (stating that "there shall be no appeal of any discretionary decision under section 212(c), 212(h), 212(i), 244, or 245 of the Immigration and Nationality Act (as in effect as the date of the enactment of this Act)"); *Moosa*, 171 F.3d at 1011-12 (interpreting transitional rules as eliminating jurisdiction over discretionary suspension decisions).

[6] The INA defines a person convicted of a crime

BIA bases its decision on a past conviction for a crime of "moral turpitude," we should apply our pre-IIRIRA standard of review.[7] In this case, the BIA based its decision on Omagah's conviction, moral turpitude, and *per se* ineligibility for suspension. We may review that conclusion, because the statute classifies it as nondiscretionary.

## III.

The BIA found that Omagah lacked good moral character because he had committed a crime of moral turpitude. That conclusion is reasonable: Conspiring to obtain, possess, and use illegal immigration documents is a crime of moral turpitude. The crime involves fraud as a central ingredient and requires proof of *mens rea* sufficient to classify it as a crime of moral turpitude.

---

of moral turpitude as lacking "good moral character." 8 U.S.C. § 1101(f)(3) (defining a person as lacking good moral character if convicted of an offense described in 8 U.S.C. § 1182(a)(2)(A) (1994 ed.)); 8 U.S.C. § 1182(a)(2)(A) (1994 ed.) (defining aliens convicted of crimes involving moral turpitude as excludable).

[7] *Kalaw v. INS*, 133 F.3d 1147, 1151 (9th Cir. 1997) ("If the BIA finds the alien falls into a per se category, then the BIA lacks discretion to grant the suspension of deportation."); *Bernal-Vallejo v. INS*, 195 F.3d 56, 63 (1st Cir. 1999) (*dictum*) (explaining that court of appeals retain jurisdiction over moral character judgments based on *per se* categories, even under the transitional rules). *See Moosa*, 171 F.3d at 1011-12 (refusing to exercise jurisdiction because the BIA had explicitly described its decision as discretionary and had assumed *arguendo* that the alien had proved both residency and good moral character).

## A.

We previously have adopted the BIA's definition of moral turpitude:

> Moral turpitude refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general. Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude. Among the tests to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind.

*Hamdan*, 98 F.3d at 186 (quoting BIA's decision in the same case) (internal citations omitted).

We concentrate on the "inherent nature of the crime, as defined in the statute concerned, rather than the circumstances surrounding the particular transgression." *Okoro v. INS*, 125 F.3d 920, 926 (5th Cir. 1997) (citing *Okabe v. INS*, 671 F.2d 863, 865 (5th Cir. 1982)). As a general rule, if a criminal statute encompasses both acts that do and do not involve moral turpitude, then the BIA cannot sustain a finding of deportability. *Pichardo v. INS*, 104 F.3d 756, 760 n.6 (5th Cir. 1997); *Hamdan*, 98 F.3d at 187. For us to sustain a finding of deportability under such an overbroad statute, the law must be divided into discrete subsections that track the distinction between moral turpitude and less severe conduct. *Hamdan*, 98 F.3d at 187.

4

In practice, the Supreme Court and courts of appeals have de-emphasized the distinction between *malum in se* and *mala prohibita* crimes. Crimes including dishonesty or lying as an essential element involve moral turpitude. In *Jordan v. DeGeorge*, 341 U.S. 223, 229 (1951), the Court held that the (potentially regulatory) offense of evading liquor taxes constituted a crime of moral turpitude. The Court did not address whether evading liquor taxes was *malum in se* or *mala prohibita*; instead, it explained "that fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude." *Id.* In the wake of *Jordan*, the courts of appeals have interpreted "moral turpitude" as including a wide variety of crimes that involve some fraud or deceit.[8]

When assessing substantive criminal laws, we have focused on the elements of the crime. If the government must prove that the defen-

dant acted with a guilty mind or intentionally deceived someone, we have been more likely to classify it as a crime of moral turpitude.[9] With these general principles in mind, we turn to the specific provisions of 18 U.S.C. §§ 371 and 1546.

### B.
Federal law establishes severe penalties for

> [w]hoever . . . utters, uses, attempts to use, possesses, obtains, accepts, or receives any [ ] visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained .
> . . .

18 U.S.C. § 1546 (emphasis added). Omagah was convicted, under § 371, of conspiring to possess and use documents in violation of § 1546. The BIA found that although *mere* possession may not rise to the level of required moral turpitude, conspiracy to possess with intent to use does rise to the level of moral turpitude. Omagah responds that the BIA's distinction is not supported by §§ 371 and 1546 or by the record of the criminal indictment and plea.

---

[8] *E.g., United States ex rel. Sollazzo v. Esperdy*, 285 F.2d 342, 342 (2d Cir. 1961) (classifying bribery of a person involved in amateur athletics as a crime involving moral turpitude); *United States ex rel. Popoff v. Reimer*, 79 F.2d 513, 515 (2d Cir. 1935) (crime of encouraging alien to lie to obtain citizenship); *United States ex rel. Karpay v. Uhl*, 70 F.2d 792, 792-93 (2d Cir. 1934) (perjury); *Calvo-Ahumada v. Rinaldi*, 435 F.2d 544, 546 (3d Cir. 1970) (making false statement under oath in application for permanent residence); *Iredia v. INS*, 981 F.2d 847, 849 (5th Cir. 1993) (credit card fraud); *Balogun v. Ashcroft*, 270 F.3d 274, 278-79 & n.1 (5th Cir. 2001) (interpreting Alabama law making illegal the forgery, possession, or use of fake credit cards); *United States ex rel. Flores v. Savoretti*, 205 F.2d 544, 547 (5th Cir. 1953) (perjury); *Kabongo v. INS*, 837 F.2d 753, 758 (6th Cir. 1988) (lying on a student loan application).

[9] *Pinchardo*, 104 F.3d at 760 (focusing on elements of the crime that might classify it as one of moral turpitude); *Okabe*, 671 F.2d at 865 ("Offering a bribe under this statute is a crime involving moral turpitude, for a corrupt mind is an essential element of the offense.") (citations omitted).

Omagah's is the latest in a series of three decisions of the BIA interpreting convictions of crimes related to § 1546. The BIA first held that forging immigration documents is a crime of moral turpitude. *In re Flores*, 17 I. & N. Dec. 225, 226 (BIA 1980). Interpreting the predecessor to § 1546, the board reasoned that, although the statute does not require a showing of intent to defraud, a fraudulent intent inheres in the act of counterfeiting documents and violating the statute. *Id.* at 228.

The BIA next interpreted moral turpitude as requiring more than mere possession of illegal immigration documents; for there to be a crime of moral turpitude, the alien also must intend to use the documents, *In re Serna*, 20 I. & N. Dec. 579, 586 (BIA 1992); "criminal possession is a crime involving moral turpitude when accompanied by the intent to commit a crime involving moral turpitude," *id.* at 584. In Omagah's case, the BIA rounded out its trilogy by holding that conspiracy to possess forged immigration documents with intent to use them involved moral turpitude.

Omagah challenges the reasonableness of the BIA's interpretation advanced in these three decisions. We review *de novo* the BIA's decision to parse §§ 371 and 1546 into separate crimes.

The BIA properly focused on § 1546, because § 371 generically prohibits conspiring to "defraud" or "commit an offense against" the United States. The BIA then interpreted § 1546 as separately prohibiting (1) simple, knowing possession of illegal documents, (2) possession of illegal documents with an intent to use them, and (3) forgery of illegal documents. Section 1546 prohibits a wide variety of crimes relating to the forgery of immigration papers: forging papers, owning blank papers, lying on applications, and impersonating another person. 18 U.S.C. § 1546(a)-(b).

As we demonstrate below, the BIA could have chosen to classify all of this conduct as involving moral turpitude, given that fraud inheres in each. Instead, the BIA has taken a consistent position that benefits aliens: The analytically distinct and lesser offenses do not constitute crimes of moral turpitude. Parsing the statute along those lines conforms to our precedent.

We find *reasonable* the BIA's decision to classify, as moral turpitude, conspiracy to possess illegal immigration documents with the intent to defraud the government. We owe *Chevron* deference to the BIA's interpretation of whether conspiring to violate § 1546 involves "moral turpitude" or impugns Omagah's "good moral character." Many courts have held an intent to defraud the government proves moral turpitude.[10]

Omagah points to two Ninth Circuit decisions to argue that such intent does not suffice; both cases are inapposite and fail to prove the BIA's interpretation unreasonable.

---

[10] *Montero-Ubri v. INS*, 229 F.3d 319, 321 (1st Cir. 2000) (finding indictment for use of false driver's license sufficient to prove moral turpitude even though mere possession would not be); *Michel v. INS*, 206 F.3d 253, 263 (2d Cir. 2000) (classifying criminal possession of stolen bus passes as moral turpitude because statute required knowledge of stolen status as an element); *Zaintona v. INS*, 9 F.3d 432, 437-38 (6th Cir. 1993) (opining that making a false statement on a driver's license application is moral turpitude); *Lozano-Giron v. INS*, 506 F.2d 1073, 1076 (7th Cir. 1974) (classifying possession of counterfeit money with intent to distribute as a crime involving moral turpitude).

In *Beltran-Tirado v. INS*, 213 F.3d 1179, 1183-84 (9th Cir. 2000), the court held that using an unlawful social security number did not involve moral turpitude. The court relied heavily, however, on legislative history from congressional amendments decriminalizing the otherwise lawful use of a fake social security number. *Id.* The panel emphasized that those amendments proved that the illegal use of a social security number on an employment verification form should not count as moral turpitude. *Id.* In *Hirsch v. INS*, 308 F.2d 562, 567 (9th Cir. 1962), the court held that making false statements to a federal agency did not involve moral turpitude.

*Hirsch*, however, may best be described as an outlier, because almost all other courts have held that intentionally deceiving the government involves moral turpitude.[11] Even if, *arguendo*, these two decisions demonstrated that the BIA's interpretation of "moral turpitude" is incorrect, neither proves its unreasonableness.

Finally, the plea of guilty and factual resume in this case amply support the BIA's conclusion that Omagah intended to defraud the United States. The convicting court accepted Omagah's guilty plea of "conspiracy to obtain, possess, and use forged, counterfeited, and falsely made immigration documents" under § 371. In the factual resume, Omagah admitted that he had attempted to buy a green card from an INS official and pay the official to change the INS's computer records. These facts, at the very least, support an indictment for conspiring to possess illegal immigration documents and defraud the United States, and the BIA has reasonably classified such a conspiracy as a crime involving moral turpitude.

---

[11] *Supra* notes 7, 9.

The petition for review is DENIED.